[No. 39859. En Banc. November 13, 1969.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT ANTHONY NIST, *Appellant.*[*]

*Peter D. Preston,* for appellant (appointed counsel for appeal).

[*]Reported in 461 P.2d 322.

*Charles O. Carroll* and *Robert E. Dixon,* for respondent.
*Robert Anthony Nist,* pro se.

HUNTER, C. J.—The defendant, Robert A. Nist, appeals from the judgment and sentence entered from his conviction by jury of the following counts contained in an amended information: three counts of kidnapping in the first degree, one count of rape, one count of burglary in the second degree, one count of assault in the second degree, and one count of taking and riding in a motor vehicle without the permission of the owner.

Two informations were filed in this case. The initial information contained two counts of kidnapping in the first degree and one count of assault in the second degree, which the defendant allegedly committed on April 18, 1967. An amended information was filed on June 8, 1967. This information, on which the defendant proceeded to trial, added four counts to the three counts contained in the initial information. The additional counts involved one count of kidnapping in the first degree, one count of rape, one count of burglary in the second degree, and one count of taking and riding in a motor vehicle without permission of the owner. The acts charged in the latter counts were alleged to have been committed by the defendant on April 4, 1967.

The events which transpired on April 18, 1967, are charged in counts 1 through 3 of the amended information. The state's evidence showed that Miss A., age 15, at approximately 3:30 p.m. on that date, had picked up her nephew, age 2, at a baby-sitter's home on Queen Anne Hill in Seattle and had begun walking to her sister's home where she was to care for the child until her sister returned home from work. On her way to her destination, the defendant pulled up to the curb in a two-tone green automobile and stopped. He emerged from the vehicle, drew a pistol, and approached Miss A. and her nephew. He ordered her to take the child and get into the automobile. The defendant then drove them to a home on Beacon Hill which had formerly been occupied by him and his ex-wife, but was vacant at the time. He parked the car in the alley behind

the house and took Miss A. and her nephew into the home. The defendant put Miss A. in one bedroom and her nephew in another.

When the defendant returned to the room in which Miss A. was held, he sat on the bed and ordered her to sit next to him. When she refused, he took the pistol and said he would shoot her if she didn't comply with his demand. Miss A. testified that she screamed and the defendant then grabbed a rag and choked her into unconsciousness. She awoke about 15 or 20 minutes later to find that her shoes, garter belt, and hose had been removed. Her clothes were also in a disheveled condition. Thereafter, the defendant put Miss A. and her nephew back into the car and returned them to Queen Anne Hill about two blocks from her sister's home. Miss A.'s rainhat was later found in the home on Beacon Hill. As the defendant's automobile sped off, after he released his two victims, Miss A. observed the license number of the vehicle and wrote it down. When Miss A. arrived at her sister's home, she called her mother who notified the Seattle police. Shortly thereafter, on the same day, Miss A. gave the investigating police officer a description of her assailant and described the events which had taken place. Although it is not specifically stated in the record, in describing these events it is reasonable to assume that Miss A. gave the investigating officer the license number of the defendant's vehicle at this time. Early the next morning, a detective gave Miss A. a number of police photographs and asked her to identify her assailant if she could. Miss A. examined the photographs and identified the defendant from one of them.

Counts 4 through 7 of the amended information charged the defendant with acts committed on April 4, 1967, involving Miss B., age 19. The state's evidence showed that on that date Miss B. returned home from her place of employment at 6:30 a.m. and entered her home in south Seattle. Upon entering, she turned and saw someone in the shadows. He immediately struck her numerous times, knocking her to the floor, and inflicting a deep cut on her head. The man then blindfolded her, took her car keys, and placed her in

her automobile which was parked outside. He then drove her to a home which she could not identify, but which the evidence indicates was the same Beacon Hill home which was involved in counts 1 through 3. A witness, Mrs. Amelia Meduna, who lived across the alley from the subject house, observed Miss B.'s automobile behind the house the morning of the 4th, and she saw a man and woman emerge from the car and go into the house. Mrs. Meduna described Miss B.'s attire and what appeared to be a sack over her head. Because the house had been vacant for approximately 4 months, she thought this was rather unusual and she decided to write down the license number of the car. Since she then had to go to the hospital to see her husband, she gave the license number of the automobile to another neighbor, Mrs. Cora Crowder, who wrote the number down on a piece of paper. This was admitted into evidence during the trial. It was shown to be the license number of Miss B.'s car.

Taken into the home, Miss B. was tied and gagged, and the defendant left for about 30 minutes. Mrs. Meduna testified that a gentleman had driven off in the automobile about 20 minutes after his arrival without the woman who had accompanied him to the home. The evidence also indicates that during the time the defendant was absent from the Beacon Hill home, he returned Miss B.'s car to the area near her home and picked up his own automobile. Upon his return, Miss B. who was still blindfolded testified that she pleaded with the defendant for her release. He refused, however, and then raped her. Thereafter, the defendant drove her to a point a few blocks from her home where he released her. Miss B. noticed that this car was not her automobile, the one in which she had originally been transported by the defendant. After her release, she was subsequently found by a neighbor, Mary Brummel, while walking along the street in a dazed condition. She had a gaping hole in her head and the witness had her lie down on the parking strip in front of her home and covered her with a blanket. This same witness identified the defendant's car as the one which had driven up the street in front of her home a few

seconds before she found Miss B. The defendant's automobile had attracted the witness' attention because it resembled in color another neighbor's vehicle and because it was being driven slowly on the wrong side of the street. She testified that the driver appeared to be looking very intently at the homes along the street. After the witness found Miss B. and was tending her in the yard, the witness testified that the same car returned and passed by her and Miss B. once again. The driver of that automobile, whom she later identified as the defendant, was driving very slowly and just looked at them as he passed nearby. He did not stop.

On April 19, 1967, the defendant was arrested at his place of employment in Seattle by two police officers who had in their possession a parole board pickup order. The circumstances surrounding his arrest will be discussed later in this opinion. The aforementioned charges were subsequently filed and the defendant pleaded not guilty to each count alleged in the amended information. The jury found the defendant guilty on all counts alleged in the amended information and also returned a special verdict that the death penalty not be imposed on counts 1, 2, and 4. The defendant's subsequent motion in arrest of judgment or in the alternative for a new trial was denied.

Prior to the trial on July 10, 1967, the trial court conducted a CrR 101.20W hearing to determine the admissibility of certain statements made by the defendant to the arresting officers shortly after his arrest and to a police officer who later on the same day interrogated him at the city jail.

Pursuant to CrR 101.20W(c), the trial court entered findings and conclusions holding that the statements were admissible against the defendant at the trial.

The defendant contends the trial court erred in admitting the statements made to the officers prior to his being placed in the patrol car and his statements taken in the patrol car and at the police station.

It is clear from the record that the warnings to the defendant of his constitutional rights, required by *Miranda*

*v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), were not given prior to his being placed in the patrol car. It is further clear that the statements of the defendant taken in the patrol car and at the police station were after he received the Miranda warnings and were therefore admissible unless tainted by the defendant's prior admissions which were obtained without the Miranda warnings having first been given.

The record shows that Detectives Miller and Delaney took the defendant into custody at his place of employment on a valid parole board pickup order around 8:50 a.m. on April 19, 1967. As the officers and the defendant left the building in which the defendant was employed, officer Miller asked the defendant if he had his car. The defendant replied affirmatively and stated that it was in the parking lot adjoining the one in which the officers' patrol car was located. The officers asked the defendant if he would mind their looking in his car and if there was a gun inside. The defendant answered no to both questions. The defendant then opened the car and the officers looked through it. The officers also inquired at this time as to the ownership of the vehicle and the defendant stated that it was his, but that it was registered in his ex-wife's name. After being shown the car, the officers took the defendant to the patrol car.

In the patrol car while transporting the defendant to the city jail and after he had been advised of his constitutional rights, the officers asked the defendant where he was residing at the present time and where he had lived prior to that. Among his former addresses, the defendant listed the Beacon Hill home involved in this case. In response to questioning from the officers, the defendant stated he had been to the Beacon Hill home either a day or two before his arrest.

Upon his arrival at the city jail, the defendant was placed in an interrogation room. Officer Allan A. Heinzlmeir testified that he entered the room and advised the defendant of his constitutional rights. He then advised the defendant that he was being accused of forcing a 15-year-old girl,

Miss A., into a car at gunpoint and having driven her to a home on Beacon Hill. Officers Heinzlmeir also testified that at the station officers again inquired as to the defendant's auto, as to the gun, and where he lived, but that the defendant did not at this time request an attorney. The defendant gave substantially the same answers that he had given at his car. The defendant did exercise his constitutional rights when the officer asked him if in fact he was the one that forced the 15-year-old girl into the car and had driven her to the address on Beacon Hill.

At the trial, both officers Miller and Heinzlmeir testified as to the admissions made by the defendant. Officer Miller testified that he had examined the defendant's automobile immediately following the arrest and stated that his purpose in doing so was: "I wanted to check the license number. That is the car." He also testified that the defendant was not advised of his constitutional rights until he was placed in the patrol car. Officer Heinzlmeir also testified that the defendant admitted, in response to questioning at the station, that he owned the automobile and that as far as he knew no one else had driven it.

Assuming the Miranda warnings should have been given in this instance, we are convinced that the statements made, and as may have affected his subsequent answers in the patrol car and at the police station, come within the rule of harmless error in view of the otherwise overwhelming evidence of the defendant's guilt in this record.

■ This rule of law was concisely stated by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), wherein the federal standard for determining harmless constitutional error was applied to the states, as follows:

There is little, if any, difference between our statement in *Fahy v. Connecticut* [375 U.S. 85, 86] about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary [prosecutor] of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the

meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

In a recent decision of the United States Supreme Court on June 2, 1969, this harmless constitutional error theory of *Chapman* was again reiterated. In *Harrington v. California*, 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969), the court in effect held that constitutional error in the trial of a criminal offense may be held harmless if there is "overwhelming" untainted evidence to support the conviction.

In *State v. Johnson*, 71 Wn.2d 239, 427 P.2d 705 (1967), we recognized the harmless error rule of *Chapman* as to a constitutionally violated right.

In *State v. Martin*, 73 Wn.2d 616, 627, 440 P.2d 429 (1968), we said:

> The rule is now definitely established in this state that the verdict of the jury in a criminal case will be set aside and a new trial granted to the defendant, because of an error occurring during the trial of the case, only when such error may be designated as prejudicial. . . .
> A prejudicial error may be defined as one which affects or presumptively affects the final results of the trial. [citation omitted] When the appellate court is unable to say from the record before it whether the defendant would or would not have been convicted but for the error committed in the trial court, then the error may not be deemed harmless, . . .

In *State v. Queen*, 73 Wn.2d 706, 711, 440 P.2d 461 (1968), we again said:

> A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case.

In the instant case the following independent testimony was offered at trial. Mrs. Mary Brummel testified that she saw a car similar to the defendant's drive by shortly before she found Miss B. in the dazed condition and that the car passed by again very slowly as she aided Miss B. Mrs.

Brummel identified the defendant at a police lineup as the one driving the car.

Miss Leona Moir, a neighbor of Miss B., identified the defendant walking by her house shortly before Miss B. was kidnapped.

Mrs. Amelia Meduna saw a car at the Alamo Place house and took down the license number. The car belonged to Miss B. Mrs. Meduna also saw a car similar to the defendant's car there that day and also on April 18th, when Miss A. was taken there.

Miss B. testified at the trial that she identified the defendant from listening to his voice.

Miss A. testified at trial that she identified the defendant from a police lineup as the one that forced her to go to the Alamo Place house. Miss A. took down the license number of the car. This was the same car that Mrs. Brummel had seen the defendant driving. Miss A. also identified the photograph of the defendant from the pictures she examined in the police station, the morning following her harrowing experience.

Miss A.'s identification of the defendant is overwhelmingly reliable when considered it was made of the photo, so soon after her kidnapping and assault, wherein she had the opportunity to observe her assailant in his car while being transported across the city of Seattle from Queen Anne Hill to Beacon Hill, during the assault while she was conscious, and on her return from Beacon Hill to Queen Anne Hill. The court can take judicial notice that the time elapsed would be 20 to 30 minutes each way.

From reviewing the evidence it is clear that there was "overwhelming" untainted evidence to support the defendant's conviction and that if there was error in allowing the defendant's admission of ownership of the car before the constitutional warnings were given, it was merely cumulative evidence constituting harmless error. There is no reasonable doubt that its absence would not have affected the outcome of the trial.

Next, the defendant contends that the in-court identifications of him by Miss A. and Miss B. were improperly ad-

mitted since the defendant was not represented by counsel at the lineups and the state failed to show any independent origin of the in-court identifications.

The lineups in the instant case were conducted prior to June 12, 1967. On that date, the United States Supreme Court handed down its decision in *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). *Wade* held that counsel must be furnished for the accused at lineups in the absence of an intelligent waiver; otherwise, the prosecution may not use evidence of lineup identifications; providing, however, that the violation of this rule is not grounds for a new trial where the in-court identification is based on observations independent of the lineup identification or where the violation of the rule constitutes harmless error. But, in *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967), the court refused to give the *Wade* decision retroactive application so as to disallow identifications made at lineups conducted before June 12, 1967.

■ Since the trial of the defendant was held after June 12, 1967, we are urged by the defendant to apply the Wade rules even though the lineups in question were conducted prior to June 12, 1967. We have previously declined three times to so hold and hence adhere to this position at this time. *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968); *State v. De Lano,* 74 Wn.2d 962, 442 P.2d 620 (1968); *State v. Brewer,* 73 Wn.2d 58, 436 P.2d 473 (1968).

In addition to the foregoing issues, the defendant also contends that the trial court erred in allowing counts 1, 2, and 3 involving Miss A. to be joined with counts 4, 5, 6, and 7 involving Miss B. since there was no evidence which showed that these transactions were perpetrated together or by the same individual.

■ The statute governing the proper joinder of charges in an information is RCW 10.37.060. It reads as follows:

When there are several charges against any person, or persons, for the same act or transaction, or for two or more acts or transactions connected together or for two or more acts or transactions of the same class of

crimes or offenses, which may be properly joined, instead of having several indictments or informations the whole may be joined in one indictment, or information, in separate counts; and, if two or more indictments are found, or two or more informations filed, in such cases, the court may order such indictments or informations to be consolidated.

We believe the joinder of the counts in the instant case is correct. The evidence shows that both series of counts which were joined for trial, counts 1 through 3, and counts 4 through 7, arose out of initial kidnapping acts in two separate instances 2 weeks apart in which Miss A. and her nephew, and Miss B. were abducted. Since counts 1, 2, and 4 involve kidnapping, they are the same class of crimes and are properly joined under the statute. *State v. Winters*, 39 Wn.2d 545, 236 P.2d 1038 (1951); *State v. Williams*, 49 Wn.2d 354, 301 P.2d 769 (1956); *State v. Smith, supra*. It does not matter that the crimes may not have been committed at the same time or close together in time. *State v. Smith, supra*.

Count 3 specifically alleges that it was committed as a part of the act or transaction contained in counts 1 and 2. Counts 5, 6, and 7 allege that the acts contained therein were committed as part of the act or transaction contained in count 4. Where, as here, we have held that the kidnapping counts were properly joined as the same class of crimes, the other counts alleged are properly joinable where evidence of one includes the other. It is clear that the counts of kidnapping cannot be tried without involving evidence concerning the other acts joined in counts 3, 5, 6, and 7. See *State v. Winters, supra*.

As to the defendant's contention that the evidence was insufficient to convict him on counts 4 through 7, except for the joining of the evidence contained in counts 1 through 3, we find it without merit. The evidence produced during the trial showed that the defendant was positively identified by both victims and by witnesses. His automobile was identified as being involved in both series of crimes and his

former home on Beacon Hill was shown by substantial evidence to be the situs of both offenses.

In view of the foregoing evidence, and other strong corroborative testimony, it is clear that the state presented sufficient evidence to sustain a conviction of the defendant on both series of counts had they been separately tried.

The defendant further contends that deputy sheriffs in the King County jail removed certain documents from his possession necessary for his defense. He alleges the removal of these documents violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. These documents, as testified to by the defendant, concerned notes of his whereabouts at the time of the crimes, names and addresses of his friends, and a small map drawn by the defendant's cell-mate relating to a crime with which he was charged. The documents were taken during a transfer of prisoners when a "shakedown" was conducted. At the preliminary hearing the defendant made objections to the removal of these documents.

■ The trial judge found that the documents belonging to the defendant had been ordered returned to him by the prosecutor when he was aware of their existence and that other papers not belonging to the defendant were properly marked and made available to both parties. The trial judge held:

> There being no showing there has been any adverse rights to the defendant or that there has been any effect upon any constitutional rights or any effect upon this trial, these items may be handed to the clerk, given an identification number, and then any record anybody wants to make in connection with them or any showing anybody wants to make in connection with them can be done. In the meantime we will have them preserved.

There is no showing in the record that use of these items was made during the trial, and in view of the above disposition made by the trial court, we find no prejudice resulting to the defendant.

■ The defendant contends that a pencil identified in his car by Miss A. was improperly admitted. The pencil was in plain view when it was seen through the car win-

dow by the witness. No motion for the suppression of this evidence was made prior to trial, nor was an objection made to its admissibility. We need not pass on the validity of such an objection. Since none was made, the objection was waived in this instance.

The defendant contends he was prejudiced by the delay of the state in delivering to him certain pictures which were made available to him by discovery proceedings. The pictures were not delivered until the day of the trial. The defendant makes no showing of any manner in which he was prejudiced by the late delivery and no request for a continuance was made. The contention is therefore without merit.

We have carefully reviewed the remaining contentions raised in the pro se brief submitted by the defendant and find them to be without merit.

The judgment is affirmed.

ALL CONCUR.

---

February 16, 1970. Petition for rehearing denied.