[No. 42800.    En Banc.    September 12, 1974.]

The State of Washington, *Respondent*, v. Virginia Chapman, *Appellant*.

*Phil Mahoney,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Bruce M. Ries* and *Geoffrey G. Revelle, Deputies,* for respondent.

Wright, J.—This is a prosecution for second-degree murder. Several questions are presented. Although there are some 16 assignments of error, the questions argued fall into three areas: (1) Were certain statements properly admitted? (2) Should a mistrial have been granted because of hearsay statements? and (3) Was a sketch of the scene properly admitted?

At approximately 2:45 a.m. on December 23, 1972, the husband of appellant was fatally shot while in the couple's apartment at 1603 Terry Avenue, Seattle, Washington. Appellant fired six shots from a .38 revolver, one of which

missed her husband and struck the wall on the other side of the apartment.

An occupant of the adjoining apartment, Mr. Wilford Skubi, called the police. Officer Knechtel of the Seattle Police Department soon arrived at the scene and was directed to appellant's apartment. He identified himself as a police officer and appellant opened the door to the apartment and said, "He shot himself." Observing a portion of the victim's body by looking over appellant's shoulder, Officer Knechtel entered the apartment to check on the condition of the victim. Upon discovering that there were several wounds in the body of the deceased, the officer placed appellant under arrest. Officer Knechtel then read appellant her constitutional rights from a standard *Miranda* warning card carried by police officers and asked her if she understood her rights. Appellant responded that she did understand them. Officer Mark Sigfrenius of the Seattle Police Department had also responded to the police call and observed Officer Knechtel advise appellant of her constitutional rights.

Officer Robert A. Christophersen of the Seattle Police Department subsequently transported appellant, along with another officer, to the Seattle Police Department's main station, a trip of approximately 10 blocks. Upon arrival at the police station, Officer Christophersen admonished appellant of her constitutional rights from the standard Seattle Police Department form 9.28.1. At this time, appellant again stated that her husband had shot himself.

Officer Christophersen offered a breathalyzer test to appellant and she signed a standard police department breathalyzer form agreeing to the test. The test was administered at 4:12 a.m. and resulted in a breathalyzer reading of .270 blood alcohol percent by weight. Expert testimony indicated that at 2:30 a.m. appellant would normally have a reading of .292; at 6:30 a.m. she would have had a reading of approximately .233; and at 7 a.m. she would have had a reading of approximately .225. The expert testimony indicated that at .300 a person normally would cease to func-

tion and would go into a state resembling unconsciousness.

During the above time, appellant was also questioned by Officer John Thomas of the Seattle Police Department for about 30 minutes and supplied the officer with "vital statistics" information. Officer Thomas testified that after giving appellant instructions not to wash her hands because of possible tests that might be administered, he summoned a jail matron to accompany appellant on her requested trip to a rest room. He further testified that appellant had tried to wash her hands several times while in the rest room. According to Officer Thomas, appellant upon returning from the rest room, said: "You didn't want me to wash my hands because of the graphite test, or something like that, did you?"

Some time prior to 6:25 a.m., appellant was questioned by Seattle police detectives Owen C. McKenna and Richard W. Reed. When a statement form was introduced into the interrogation by the detectives, appellant protested giving a statement. According to his own testimony, Detective McKenna responded: "I told her basically to keep quiet, that this form had to be done, it was a matter of paperwork and the format in the office." After going through her constitutional rights on the statement form with the detectives, appellant hesitated in signing the form and asked if she could have an attorney "now." Detective McKenna testified that he told appellant that she could have an attorney if she could contact one and explained to her that she could have a court appointed attorney if she didn't have the money for an attorney. He further told her that the earliest she could have an appointed attorney was on the following Monday morning, and that she would have to remain in jail in the interim. A representative of the public defender's office, Richard Brothers, testified that his office has a contract with the City of Seattle to provide an attorney service 24 hours a day, 7 days a week; and two attorneys from the public defender's office were on call at the time and available.

Appellant then signed two conflicting written statements on police statement forms. These forms contained an acknowledgment and waiver of constitutional rights. First, she signed a written statement which basically contained an explanation that the victim had shot himself. However, when she was told how many shots had entered the body of deceased, she said: "Why in the hell didn't you tell me that in the first place and I would have told you the truth." Appellant then signed a second written statement wherein she admitted shooting her husband and her intention to kill him. This final statement was taken over a period of approximately 25 minutes, from 7:05 a.m. to 7:30 a.m. The two detectives testified that appellant did not hesitate, lose her train of thought or express any lack of memory during the taking of that statement.

All the officers testified that appellant appeared to be quite normal; one officer stated she was calm and soft spoken. Other officers stated she walked properly and displayed good balance. All said she appeared not to be intoxicated.

*Were the statements given by appellant properly admitted?*

■ This question has two aspects. First, we will consider appellant's contention that she could not make an intelligent waiver because of intoxication. There was substantial testimony to support the trial court's finding that appellant was capable of making an intelligent waiver. Furthermore, appellant herself never testified that she was intoxicated when making the statements. If there is substantial evidence to support the finding of the trial court it will not be disturbed. *Sylvester v. Imhoff*, 81 Wn.2d 637, 503 P.2d 734 (1972); *State v. Braun*, 82 Wn.2d 157, 509 P.2d 742 (1973).

■ Next, we will consider if the appellant asked for an attorney and if at that time all questioning should have stopped. The language of *Miranda v. Arizona*, 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974

(1966) is very plain. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."

A case similar to the instant case is *Commonwealth v. Nathan,* 445 Pa. 470, 285 A.2d 175 (1971). That case holds interrogation should stop as soon as the accused states he wants an attorney.

This matter involves no fact question. There was no dispute as to the substance of the various conversations. The problem here is the effect in law of the words that were spoken. In light of *Miranda v. Arizona, supra,* the interrogation should have stopped as soon as appellant indicated she wanted an attorney. It is clear that appellant's questions if she could have an attorney "now" were, in fact, a request to have an attorney, even if not artfully expressed.

The statements taken after appellant expressed a desire to have an attorney were improperly admitted.

*Should a mistrial have been granted because of hearsay testimony?*

The testimony of Officer Thomas relative to the attempt of appellant to wash her hands was admittedly hearsay. Upon objection the court instructed the jury to disregard the hearsay testimony. Appellant contends the instruction was insufficient to cure the error. In this regard appellant relies upon *State v. Willis,* 40 Wn.2d 909, 246 P.2d 827 (1952). That case is not at all in point, for in *Willis,* the trial court refused to strike the hearsay answer. It was the refusal to strike that was held to be error.

The instruction to disregard the testimony was adequate. It should be remembered the issue of appellant's washing her hands arose at a time when she was claiming her husband's death was self-inflicted. After she admitted firing the fatal shots and raised the defense of self-defense, the matter of tests upon her hands became immaterial. In fact the record does not show any such test was ever given.

*Was a sketch of the scene properly admitted?*

■ A sketch made by homicide detective Richard W. Reed was admitted into evidence over objection. The jury was fully informed that the sketch was not to scale and was made from memory. The purpose of the drawing was to illustrate the detective's idea of the direction from which a bullet was fired.

The use of demonstrative evidence is to be favored. *King County v. Farr,* 7 Wn. App. 600, 501 P.2d 612 (1972).

The trial court is given a wide latitude of discretion in determining whether or not to admit demonstrative evidence. *Pulley v. Pacific Coca-Cola Bottling Co.,* 68 Wn.2d 778, 415 P.2d 636 (1966); *Kiessling v. Northwest Greyhound Lines, Inc.,* 38 Wn.2d 289, 229 P.2d 335 (1951).

Because of the admission of statements taken without the presence of counsel after appellant had indicated a desire for an attorney, and only for that reason, this matter must be reversed and remanded.

FINLEY, ROSELLINI, HAMILTON, STAFFORD, UTTER, and BRACHTENBACH, JJ., concur.

HALE, C.J. (dissenting)—I dissent to a new trial granted here on what appears to me to be insubstantial grounds. In a case where the proof of guilt was overwhelming and undeniable and the defendant had been informed repeatedly of her rights under the *Miranda* doctrine, I do not believe it reversible error, even under *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), that the written statements were received in evidence. The best proof that defendant waived whatever immunities she subsequently claimed under the *Miranda* principles is that, after having been fully informed repeatedly, she nevertheless voluntarily continued to make incriminating statements to the police and voluntarily signed the written statements into which her admissions had been incorporated. Her state of mind and mental capacity to understand the nature and consequences of her statements were issues of fact to be decided by the jury, supported in

this case by substantial proof that defendant was at the time mentally competent to appreciate all of the circumstances of her arrest and interrogation. There being substantial proof that all admissions and statements were voluntary, uncoerced and competently given, the admission fell to the discretion of the court. I agree with the trial court that, there being substantial evidence to support the findings of the trial court, they ought not be thereupon disturbed. *Sylvester v. Imhoff,* 81 Wn.2d 637, 503 P.2d 734 (1972); *State v. Braun,* 82 Wn.2d 157, 509 P.2d 742 (1973).

I think the rule disastrous to the administration of the criminal law that, where an accused has been carefully informed of his rights, privileges and immunities according to the *Miranda* principle and has voluntarily waived them by speaking freely and answering questions, the entire interrogation and the confession, no matter how fully corroborated it may be by other evidence, shall be rejected or a judgment reversed merely because at some time or another during the interrogation the accused has indicated a preference to have counsel present while at the same time continuing to speak.

Accordingly, I would affirm.

HUNTER, J., concurs with HALE, C.J.