[No. 1806-2.    Division Two.    January 20, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES D. HAYNES, *Appellant*.

*Jerome L. Buzzard* and *Buzzard & Glenn,* for appellant.

*Craig Ritchie, Prosecuting Attorney,* for respondent.

REED, J.—James D. Haynes appeals his jury convictions for second-degree murder and second-degree assault. Defendant primarily challenges the trial court's refusal to grant a change of venue and the admissibility of certain statements he made to the police. Other assignments of error relate to the State's destruction of evidence damaging to the credibility of a prosecution witness; to the alleged inadequacy of defendant's trial counsel; and to the admissibility of photographs of the death scene and other evidence. We affirm.

Defendant's marriage had foundered, and dissolution proceedings had begun. He departed Washington for a visit in California, expecting to return late Sunday, October 6, 1974, or early the next day. Instead he returned in his motor home unexpectedly at about 11:30 p.m. on October 5, to find the family home in Agnew full of teenagers attending a birthday party for his 16-year-old stepdaughter, Teresa Goin. Defendant smelled marijuana and could see beer and whiskey bottles in the house; Thomas Suave, Mrs. Haynes' boyfriend, was sitting close to her on the couch. Disgusted and angry, Haynes ordered the revelers out of

the house. People began to leave, including Suave, who was seen to get in his car and drive away. Teresa saw her stepfather pull a gun from his trousers and shoot it. General panic ensued. Others heard shots, and one young man, Scott Percival, was seriously wounded. Haynes' wife, Joyce, was found dead of multiple .38 caliber gunshot wounds in a neighbor's yard, where the neighbor saw defendant running. Haynes' testimony was that Joyce pulled a .38 caliber revolver from a nightstand, they struggled and he gained possession of the gun, it discharged into the wall or ceiling, and he followed her out of the house. Outside, he claimed to have exchanged shots with a shadowy figure who got away. Scott Percival saw Haynes with his arm outstretched and an object in his hand, but Teresa was the only one who saw defendant or anyone else with a gun. No gun was found, although the surrounding area was searched thoroughly.

### Change of Venue

The crime occurred in Clallam County, a rural area served largely by news media from Port Angeles, some 12 miles from Agnew. The homicide was a major news event in the county, and was given prominent play by the local press. The Port Angeles Daily News carried front page articles on the story every publication day from October 7 to October 13. Defendant was initially released on bail. Then on October 10, Superior Court Judge Chamberlin, who was temporarily disabled, conducted a bail revocation hearing in his home.

Defendant alleges that several occurrences at the hearing illustrate why venue should have been removed to another county. The judge, in explaining to the citizens present why he had initially authorizd bail for Haynes under CrR 3.2, said "perhaps it is alien to you or foreign to you to realize that somebody that kills another person can be placed on bail." The judge asked a citizen, sworn in order to give his reasons for seeking bail revocation, "What information do you have, other than the fact that this man has committed a crime?" In addition, the Daily News quoted

the judge as saying "even though he is charged with homicide, there is nothing to indicate he is going to repeat;" and,

> Chamberlin said the defendant's aggressive tendencies appear to go beyond the October 5 incident, because on two other occasions Haynes released his aggressive impulses with firearms.[1]

Defendant argues these comments demonstrate an improper assumption of guilt by the judge who was later to deny the motion for change of venue (but not to preside at trial), and that their impact, when reported in the press, had to have poisoned the possibility of obtaining an unbiased jury from Clallam County.

Haynes cites other examples of activities which he urges were given such wide publicity as to warrant a change of venue. At the bail revocation proceedings, the prosecutor presented the judge with petitions from citizens urging revocation. Dozens of citizens telephoned law enforcement agencies to protest defendant's release on bail and many were quoted in the newspaper voicing their displeasure at his release. The schools released pupils to search for the murder weapon. A front page newspaper account featured a picture of policemen with dogs searching for the suspect.

The sum of defendant's arguments is that the pretrial atmosphere relating to his case was so tainted by the prominent newspaper coverage, the citizen complaints and involvement, and the comments of the judge and law enforcement authorities, that he could not have obtained an impartial jury.

Our traditional role in reviewing a venue decision is defined by *State v. Malone*, 75 Wn.2d 612, 614, 452 P.2d 963 (1969):

> A motion for a change of venue in a criminal case is directed to the sound discretion of the trial court, and its decision with respect thereto will not be disturbed on appeal, absent a convincing showing of an abuse of discretion.

---

[1]Defendant had been arrested in 1961 for separate incidents of assault with a gun and carrying a concealed weapon. Neither arrest resulted in conviction.

*See* CrR 5.2(b). However, where the circumstances involve a probability that a defendant's right to an impartial jury will be prejudiced, due process is violated by a failure to change venue even without a showing of actual prejudice. *State v. Stiltner*, 80 Wn.2d 47, 491 P.2d 1043 (1971). Therefore, we must independently review the record to determine whether there was a reasonable probability of juror prejudice at the time of trial. *State v. Stiltner, supra; State v. Wilson*, 16 Wn. App. 348, 555 P.2d 1375 (1976); *State v. Warwick*, 16 Wn. App. 205, 555 P.2d 1386 (1976).

The factors commonly utilized in reviewing a venue decision based on pretrial publicity are listed in *State v. Crudup*, 11 Wn. App. 583, 587, 524 P.2d 479 (1974):

(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

Applying these criteria, we find (1) The news accounts of this homicide were responsible and "contained factually accurate material of a relatively nonsensational nature". *State v. Wilson, supra* at 354. (2) and (3) Press coverage was extensive at first—including front page play in the Daily News for a week following the crime—but was virtually nonexistent between October 13, 1974, and the trial in February 1975. (4), (5), and (6) The voir dire was conducted carefully and competently, the defense used 9 peremptory challenges and several others for cause, and of those 7 jurors who said they had read about the crime, all declared they could nevertheless be impartial and decide the case on the basis of the evidence. (7) Although news accounts quoted statements of the pretrial judge, prosecu-

tor, and police officials, there is no suggestion or indication they attempted to "leak" stories to the press or in any way tried to intensify or manipulate the press coverage to the prejudice of defendant. Judge Chamberlin's statements in the bail revocation hearing merely reflect an attempt to mollify citizen concern and his awareness of the premise underlying pretrial release concerns, *i.e.*, that the prosecution may demonstrate that the accused, although presumed innocent, does offer some risk of flight or danger from which society is entitled to protection. *See* CrR 3.2. There is no affirmative indication in the record that the judge's reported comments influenced any juror. (8) The charge of first-degree murder, of course, warranted particular caution in assuring an impartial jury, which we are convinced was accomplished in this case. (9) Finally, the jury pool was drawn from the whole of Clallam County, and at least three of the panel selected were from towns many miles distant from Port Angeles and had not read of the crime. This jury represented a fairly good geographic cross-section of the county.

It is axiomatic that courts in largely rural counties should give careful consideration to a change in venue for an unusually notorious crime such as a homicide, and should not hesitate to transfer the cause for trial in a more neutral environment if it is apparent the local atmosphere has become charged beyond assurance of an impartial jury. In this case, however, no probability of prejudice is apparent and, consequently, there was no abuse of discretion in the retention of venue in Clallam County.

### ADMISSIBILITY OF STATEMENTS

Defendant challenges the admissibility of statements attributed to him by Deputy Terry Roth at trial. Relying on *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), as applied in *State v. Chapman*, 84 Wn.2d 373, 526 P.2d 64 (1974), Haynes argues that police questioning of him should have stopped when he asked to see his attorney, and that the admission at trial of the statements he made thereafter is reversible error.

Defendant's statements in issue were first recounted by Deputy Roth at a CrR 3.5 hearing, where he described them as largely spontaneous and voluntary, and the court so found. As the following testimony by Roth at trial makes clear, however, some of the statements declared admissible were preceded by police comments:

Q Can you recall those statements at the station?

A [By Roth] Detective McDonald and I were in the squad room with the defendant and I asked the defendant if he was aware of the charges for which he had been arrested.

Q Do you recall the response?

A He didn't, to my knowledge, make a verbal statement at that time. He just looked at me.

Q Okay, was anything else said by anyone there?

A I then advised him of the nature of the charges.

Q And did he make any response?

A He did.

Q What was the response?

A I told him that Joyce was dead and to that he replied, "I know that."

Q Did you tell him anything else?

A Yes, I told him that two other persons had been shot.

Q And what was the response to that?

A The defendant stated that, "He did not mean to hurt anyone else." — or, "Any of them."

Q Did he say anything else at that time that you can recall?

A Yes sir, it was a continuation of his comment that he had made earlier, shortly after being taken into custody. This was in regards to the dog handlers that had used the search dogs.

Q Okay, what were the statements, if you can recall?

A Defendant knew that the search dogs had been used in an attempt to locate him in the early morning hours on the 6th. He indicated that he could have shot them several times, if he had wanted to, but he didn't want to hurt any officer. He further indicated that he had taken off his socks in an attempt to distract the scent of the dogs while trailing him.

Q Okay, I'll show you what has been marked State's Exhibit 50. Do you recognize that exhibit?

A Yes sir, I do.

Q Where did you get this exhibit?

A  The exhibit was drawn and given to me by the defendant while awaiting the arrival of his attorney, Mr. Froude, in the squad room of the Sheriff's office.

Q  Would you describe for the record what the general description of Exhibit 50 is?

A  Yes sir, this is a diagram of an area near where the defendant was taken into custody. It was drawn because of the children that the defendant had expressed to me about someone being hurt by the firearm that he had lost.

Q  Okay, what did he tell you about this exhibit?

A  He wanted to—he volunteered to go back out and show us where the weapon was. We could not allow that. He then wrote out the diagram of the exhibit as giving an approximation of the location in which I could search.

*State v. Chapman, supra,* holds that police custodial interrogation must cease once a suspect asks for an attorney, until an attorney is present. This admonition was violated in the instant case. The above colloquy took place in the sheriff's office, apparently an hour or two after defendant had been advised of his rights and had requested assistance of counsel. After asking him if he was aware of the charges and getting no response, Deputy Roth persisted on this point. He told Haynes that Joyce was dead, eliciting the loaded response, "I know that." The officer then told defendant that two others had been shot,[2] and defendant replied that "He did not mean to hurt anyone else", or "any of them", raising an arguable inference that he had been shooting and meant to hurt only Joyce. These statements were clearly in reaction to what the officer told Haynes. In addition, defendant's statements about the dogs and his drawing of the map were evidently a continuation of his uncounseled response to the officer's promptings.

Although Deputy Roth did not engage in the overtly coercive, inquisitorial pressures most offensive to the Fifth Amendment, *Miranda* makes clear that improper interrogation can often involve more subtle tactics. *See Miranda v.*

---

[2] In addition to Scott Percival's wound, another party guest's arm and shirt sleeve were apparently creased by a bullet.

*Arizona, supra* at 448-56. The State has the burden, therefore, of demonstrating that a custodial statement was voluntary and not produced by improper police action. *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968); *State v. Toliver*, 6 Wn. App. 531, 494 P.2d 514 (1972). It has recently been decided that a defendant who has exercised his *Miranda* right to remain silent, and whose right to cut off questioning has been "scrupulously honored" by the police, may nevertheless be subsequently questioned under appropriate circumstances to elicit admissible statements. *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321 (1976); *State v. Robbins*, 15 Wn. App. 108, 547 P.2d 288 (1976). But it apparently remains the rule even after *Michigan v. Mosley, supra*, that a suspect who cuts off police questioning by requesting the presence of counsel, cannot constitutionally be questioned thereafter by the police until he obtains the advice of an attorney. *Michigan v. Mosley, supra* at 101 n.7; *State v. Boggs*, 16 Wn. App. 682, 559 P.2d 11 (1977); *see State v. Chapman, supra*.

Regardless of the possibility that Deputy Roth may not have intended to obtain incriminating statements and may simply have wanted to specify the charges for the accused, the fact remains that his persistent remarks prompted inculpatory responses by Haynes, shortly after Haynes had asked for the assistance of his attorney. We hold that it was improper to permit Deputy Roth to relate Haynes' statements in issue and his drawing of the map to the jury. *State v. Chapman, supra; State v. Boggs, supra*.

Having thus concluded, however, we are likewise convinced that admission of defendant's statements was harmless error. In the context of statements admitted in violation of the dictates of *Miranda*, we must be satisfied the error was harmless beyond a reasonable doubt when viewed in the light of other "overwhelming" evidence to convict. *Chapman v. California*, 386 U.S. 18, 17 L. Ed 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *United States v. Stanley*, 427 F.2d 1066 (9th Cir. 1970), *modified on other*

*grounds*, 400 U.S. 936, 27 L. Ed. 2d 242, 91 S. Ct. 234 (1971); *State v. Nist*, 77 Wn.2d 227, 461 P.2d 322 (1969).

In this case, the requisite additional evidence exists. Haynes was described by several witnesses as in an angry mood when he ordered everyone from the house. Two witnesses heard him say, "Clear out while you are still safe." His stepdaughter saw him pull a gun and shoot it, although she had run toward her bedroom and could not then see her mother. Another witness, David Wood, saw no gun, but heard Joyce Haynes scream, "Jim, don't," followed by a shot. As he was brought down by a gunshot, Scott Percival saw defendant with his arm extended and holding something. Haynes was known to own a .38 caliber revolver, and a holster suitable for a .38 caliber revolver was found in open view in the motor home in which he had just arrived. He was seen running from the area where his wife's body was found. He hid in the woods after the shooting. While in custody, he uttered many clearly admissible statements suggesting guilt, including that he would have killed himself had his affairs been in order, and asking the officers, "What would you have done if you had walked in on a thing [party scene] like that?" In addition, his own story about a shadowy figure shooting at him from the driveway lacks the ring of truth and was totally uncorroborated—although several teenagers had fled the house at the sound of shots and were in a position to see such a figure as they entered cars in front.

Our conclusion that admission of the statements was not reversible error is readily reconcilable with *State v. Chapman*, *supra*. In that case, a homicide defendant was interrogated in the early morning hours on a Saturday. She asked for an attorney "now" and was told that indigent representation was not available until the following Monday morning, until which time she would have to remain in jail. This was incorrect, for a public defender was on call at all hours. The defendant then signed a statement to the effect the victim had shot himself. But, when told that the body bore several wounds, she recanted and signed a second

statement admitting the murder. Thus, the abuse of the Fifth Amendment as construed in *Miranda* was substantial, and the *Chapman* court did not evaluate the additional evidence to ascertain if the error could be deemed harmless. In the instant case, however, the other evidence against defendant was "overwhelming," and included many statements not produced by interrogation. When we weigh against the evidence the assumed error in admitting defendant's two brief statements, the error was harmless beyond any doubt. *United States v. Stanley, supra; State v. Nist, supra; State v. Boggs, supra.*

Defendant also challenges the admissibility of certain other statements made by him after his arraignment. In the midst of trial, the court conducted a hearing into the voluntariness of the statements but did not set forth in writing the disputed and undisputed facts and its conclusions, as required by CrR 3.5(c). Defendant's trial objection to their admission was, for the most part, based on the context of the statements and his meaning, as opposed to the inferences drawn by the relating officers. Only a few of them were contested on grounds they were involuntarily stated. As for some statements the defendant denied making, the court did not prevent him from so contending during trial or from attempting to impeach the officer's version. The court excluded one statement as involuntary and gave adequate oral reasoning in ruling that the other statements, if indeed made, were voluntary. The absence of written findings and conclusions arising out of the midtrial CrR 3.5 hearing was not prejudicial to defendant and did not hinder our review of the issue he raised. In these circumstances, the omission was not prejudicial error.

SUPPRESSION OF STATE'S EVIDENCE

We turn next to defendant's contention that certain evidence favorable to the defense was withheld by the prosecution. This argument is premised on the fact that Detective McDonald destroyed some marijuana he found in Teresa Goin's purse while investigating the homicide at the Haynes' home. His express reason was that he opted to

not charge Teresa with misdemeanor possession of the drugs in view of her mother's tragic death. Defendant argues he should have been able to introduce the marijuana along with evidence of use of alcohol by those at the house to attack Teresa's capacity to observe the actions of Haynes and her mother on the night of the murder.

CrR 4.7(a)(3) and (4) require the prosecutor to disclose to the defense any material or information within his knowledge, possession, or control which tends to negate the defendant's guilt. Before the defense requests discovery, the duty of disclosure exists as a duty of *preservation* of favorable evidence. *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976). Destruction of such evidence "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). In sum, law enforcement authorities must preserve and disclose evidence if there is a "reasonable possibility" it would be material and favorable to the defense. *State v. Wright, supra.*

Although we strongly disapprove of the police destruction of potential evidence in this case, it did not violate due process of law. The officer inserted the discovery of marijuana in his report, and its existence was known to the defense well in advance of trial. The prosecutor offered to stipulate where the marijuana had been found and to allow the defense to introduce a facsimile of the substance. Detective McDonald was cross-examined fully on where it was found and whether it was proper procedure to destroy it, as well as about the alcohol found on the premises. Defense counsel argued to the jury that the marijuana and alcohol must have impaired the faculties of the teenaged witnesses. Admission of the actual marijuana found by the police could have added nothing to the defense, and its destruction could not have affected the outcome of the trial. *See State v. Haga*, 8 Wn. App. 481, 507 P.2d 159 (1973).

Defendant also complains of the failure of the prosecutor to produce jail records which would have verified his pres-

ence in the hospital at the time an officer testified Haynes stated in jail that "next time he'd have a machine gun so that he could do a better job of hitting the one he was aiming at." There is, however, no showing the defendant was prevented from obtaining the jail records by subpoena. Moreover, the defense introduced hospital records demonstrating that Haynes was in fact in the hospital and not in jail when the statement was allegedly made, thereby making the very point the jail records would have established. Without deciding whether CrR 4.7(a)(3) and (4) would compel the prosecutor to supply jail records without their being subpoenaed, we find no prejudice to the defendant in the failure to supply him with the records in this case.

## COMPETENCE OF TRIAL COUNSEL

Out of a lengthy trial and pretrial record, counsel on appeal, who was not present at trial, has selected the following examples in support of the allegation of inadequate representation: (1) an alleged lack of preparation, as manifested by a paucity of pretrial conferences with defendant; (2) purportedly ineffectual voir dire; (3) two brief, profane comments to the prosecutor—one of which the court reporter noted was possibly inaudible to the jury; (4) failure to call several defense witnesses; (5) failure to question FBI witnesses concerning their inability to identify shell casings at the murder scene; and (6) counsel's misstatement during closing argument of the date on which defendant was shown to have been in the hospital when he was reported to have made a damaging statement in jail.

■ This assignment of error specifically challenges the actions of one of defendant's two trial attorneys, who is unfortunately now deceased so that his tactics must be defended without benefit of his personal recollections, ironically enough by the prosecutor who opposed him at trial. After considering the allegations and the entire record, we are convinced the defendant was accorded a fair and impartial trial and effective representation by his attorneys, including the late Nathan G. Richardson. *State v. Darnell*, 14 Wn. App. 432, 542 P.2d 117 (1975).

ADMISSIBILITY OF EVIDENCE

Finally, there is no merit in the errors assigned to admission of certain photographs, drawings, and other evidence. No authority is cited to support the alleged errors, and we need not consider them on appeal. *State v. Brewster*, 75 Wn.2d 137, 449 P.2d 685 (1969). In addition, the court had discretion to admit or reject the photographs and drawings, and it does not appear to have abused that discretion. *State v. Vidal*, 82 Wn.2d 74, 508 P.2d 158 (1973).

As for the asserted duty of the court to exclude the testimony of a neighbor, Gunnar Carlson, whose identification at trial of Haynes as having run through his yard was in conflict with his prior inability to identify the figure, again no authority is cited on point. Dispositive of the issue, however, is the fact that the contradiction was apparently a surprise to both prosecutor and defense and was explained by the witness as his initial reluctance to identify a murderer still at large. Defense counsel also used the prior signed statement to impeach the witness' version at trial. In the absence of a showing the State made a tactical, surprise use of the more damaging identification at trial, the testimony was properly handled by the court.

The judgment is affirmed.

PETRIE, C.J., and HALE, J. Pro Tem., concur.

Petition for rehearing denied February 28, 1977.

Review denied by Supreme Court July 27, 1977.