[No. 2692–2.   Division Two.   May 17, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. JACK L. WEBSTER, *Appellant.*

*Philip M. Best* and *Tim Fough,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Kenneth R. Parker, Deputy,* for respondent.

SOULE, J.—Jack Webster appeals from a conviction for third–degree theft. We affirm the judgment and sentence.

Essentially, the assignments of error can be reduced to three issues. The first is whether reversal is required because evidence was offered and commented upon by the prosecuting attorney, all without objection or claim of surprise and which evidence would have been excluded upon proper objection. Secondly, at what point during a field investigation must an officer give the *Miranda* warnings to one of whom he is making inquiry. The last issue is whether the police conducted a lawful search of the defendant and of the woman's purse taken from him during the field investigation.

808 Fifth Street in Bremerton is the location of a walk–up flat above a book store. It is in an area of that city which is active in the evening. The quarters are served by a stairway entering from the sidewalk and we deduce from the testimony that the stairway serves only the one living area. At 1 a.m. on the morning of September 2, 1976, Officers Burton and Dennis were on patrol in a squad car. As the officers approached the above–mentioned area, they saw three men standing near the stairway, or "milling around" as the officers described it, and looking up and down the street. This conduct impressed the officers as unusual, so they drove around the corner, doubled back into the alley and took up a position in a somewhat elevated parking lot from which position they could observe the conduct of the men and the premises.

As they gained their viewpoint, they saw defendant break off from his companions and go up the stairs. They lost sight of defendant momentarily and then saw him in a

lighted area of the flat. The flat had windows facing the street, which were either lightly curtained or had the curtains drawn back. As he moved about, defendant was visible from the waist up. He was seen to move about in a stealthy manner; he disappeared from sight for a few seconds, reappeared in the lighted area and the officers testified that he moved as if to pick up an object. He then left and was next seen as he returned into view at the foot of the stairs. He looked right and left, placed an object under his sweatshirt on the left side and moved eastward to join one of his companions. It is disputed whether he put the object in his belt as defendant asserts, or whether he merely held it under his sweatshirt by arm pressure. At this point, as the officers drove alongside defendant, he voluntarily approached them and asked them for directions to 608 Fifth Street. Without answering the question the officers immediately ordered defendant to put his hands on the patrol car. When he declined to do so, the officers forcibly put him in the traditional search position and started a weapons frisk. As they did so, a woman's purse, about 4 x 8 inches in size, fell or was knocked from under defendant's sweatshirt. As he retrieved it, Officer Burton said something to the effect, "What do we have here?" Defendant replied, according to the officers, "That's my wife's." The officer opened the purse to look for identification, found a driver's license and asked the defendant his wife's name. To this inquiry, defendant refused to respond. Thereupon, he was arrested and given his *Miranda* warnings.

The foregoing statement of defendant was made the subject of a CrR 3.5 hearing before a judge other than the trial judge. At that hearing and at the trial, defendant denied making any such statement. The court found that the officers were justified in investigating defendant's activities, that the statement was in fact made, that at the time the statement was made the officers were in the investigative stage of the proceeding, that the defendant was not at that point in such custody as would require the *Miranda* warnings, and that the statement was voluntary and not the

product of coercion. The court ruled that the statement was admissible.

The court did not then or at any later stage of the proceedings, rule on the admissibility of the fact that the defendant did not respond to the inquiry about his wife's name.

During the course of the trial the prosecuting attorney elicited information concerning defendant's nonresponse from Officer Burton. The prosecuting attorney also predicted Officer Burton's evidence on this subject in his opening statement, and made a further brief comment upon it in his closing argument. No objection was made at any time to this procedure. As a result, the trial court was not called upon to make any ruling on the matter of defendant's silence in response to the inquiry.

At the trial, an occupant of the flat identified the purse as hers and testified that defendant did not have permission to enter. Her only roommate also testified as to the lack of permission for defendant to enter.

Defendant testified that he entered the premises by mistake after receiving an invitation to visit a Debbie Johnson at 608 5th St., that he took nothing from the apartment but tripped on the purse as he was coming down the stairs and picked it up at that time. Defendant did not even suggest that after having picked up the purse, his intention was to find the owner. Indeed, his testimony was such that the jury could and evidently did, conclude to the contrary:

We started to go to the In and Out to—to find out if— *not who owned the purse,* but to find Debbie Johnson.

(Italics ours.)

Defendant did have in his possession, at the time of his arrest, a drink coaster from a nearby tavern where he had met Debbie Johnson, which coaster contained her name and the address, "608 5th St."

■ At trial, defendant was represented by an experienced attorney who had been actively practicing for more

than 15 years. Yet, defendant failed to object to the testimony concerning his silence. He is thereby precluded from raising this issue on appeal unless the action caused such marked prejudice that no instruction or admonition by the court could have cured it. *State v. Green,* 70 Wn.2d 955, 425 P.2d 913 (1967) is directly in point. As a matter of fact, the circumstances there were even stronger because in that case, defendant had already been arrested and given his *Miranda* warnings. During that trial, a police officer volunteered the testimony that after some conversation the defendant said: "I won't talk anymore. I want to talk to my lawyer." The court held that it was improper for the evidence to be offered and it was improper for the deputy prosecutor to allude to the fact in his argument, but since no objection was made, the court would not review the alleged error. The court said on page 963:

> We are convinced that had the trial court had a chance to admonish the jury against this evidence and argument no prejudice would result.

There is even better reason for refusing to consider the error assigned in this case. As early as the CrR 3.5 hearing, it was plain that this matter of the nonresponse to the question, "What's your wife's name?" was in the case, yet no request was made for a ruling on its admissibility at that time nor was a motion in limine made at the outset of the trial. There could have been no surprise to defendant in this case. It is not as in the *Green* situation where the police officer at the trial volunteered the testimony in excess of the answer required by the question. *See State v. Case,* 49 Wn.2d 66, 298 P.2d 500 (1956) for discussion of the rule on more flagrant facts.

We recognize that generally, the defendant has a constitutional right to remain silent during a custodial interrogation and to have knowledge of that silence withheld from the jury, but we will not afford him the luxury of a tactic which we have reason to believe is employed with some increasing frequency, namely, gambling on the verdict by remaining silent in the face of an offering of evidence by an

over–eager deputy prosecuting attorney which includes potential constitutional error in hope of successfully assigning that error on appeal in the event of an adverse verdict.

In the case before us, the evidence based on defendant's own in–court testimony points overwhelmingly to guilt, quite apart from the fact that he remained silent when he was asked his wife's name. Further, the jury evidently believed his testimony that he entered the apartment by mistake and his admission that he picked up the purse on the stairs as he was leaving, for they did acquit him on the charge of burglary, and convicted him only on the charge of theft. We have no hesitancy in holding that the defendant was not excused from objecting to the testimony and the two brief comments of counsel when they were offered. We find beyond a reasonable doubt that the error was harmless in view of the total record under the test set forth in *State v. Nist,* 77 Wn.2d 227, 461 P.2d 322 (1969); *State v. Haynes,* 16 Wn. App. 778, 559 P.2d 583 (1977); *State v. Boggs,* 16 Wn. App. 682, 559 P.2d 11 (1977). In no way did the conduct of the deputy prosecuting attorney approach that which was the basis for the reversal in *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967).

The next issue to be determined is whether the interrogation was conducted in a "custodial" atmosphere within the meaning of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). *Miranda* focuses primarily upon station house interrogation but is not limited to it.

> By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda v. Arizona, supra* at 444. Footnote 4, which is the footnote to that quotation says: "This is what we meant in *Escobedo* [*Escobedo v. Illinois,* 378 U.S. 478 (1964)] when we spoke of an investigation which had focused on an accused." The physical site of the custodial inquiry may

even be in one's own home. *Orozco v. Texas,* 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095 (1969); *State v. Dennis,* 16 Wn. App. 417, 558 P.2d 297 (1976). The decisions of this state recognize, however, that not every interrogation is a "custodial" interrogation within the *Miranda* requirements, even though the subject is temporarily not at liberty to depart. An officer may briefly detain and question a person even though there is no probable cause to arrest without violating the Fourth Amendment.

We believe that the facts in this case are sufficiently similar to those in *State v. Hilliard,* 89 Wn.2d 430, 573 P.2d 22 (1977) for that case to be controlling. There, although the officers testified that defendant was not free to go until he answered certain questions satisfactorily, the interrogation was held to be noncustodial in the *Miranda* sense. Similarly, in the case at hand, the defendant was not free to go until he had provided an explanation for his suspicious conduct. During this investigatory period, the questioning was not of a custodial nature since it was not even clear to the police that a crime had been committed. It was not until the defendant refused to answer a critical question that the officers had probable cause to arrest, thereby triggering the duty to give the *Miranda* warnings.

As we read *Hilliard,* it retreats slightly from the principle enunciated in *State v. Creach,* 77 Wn.2d 194, 461 P.2d 329 (1969), that the interrogation must be under circumstances where there is absolutely no pressure from police presence and that the subject must be free to leave at any time. We feel that this retreat is a recognition of the reality that it would be poor social policy to require the police to walk away from a situation such as existed in *Hilliard* simply because there was as yet no probable cause to arrest, although the circumstances were suspicious and required investigation.

In the present case, a more impetuous officer perhaps might have concluded that he had probable cause to arrest for burglary but if he had done so, he would have taken the risk that the subject had in fact entered his own quarters,

perhaps in search of funds with which to continue his evening's recreation and moved stealthily to avoid waking up a potentially irate wife.[1] What happened here seems to be eminently sensible. The officers were curious, but if there was an innocent explanation it could be obtained without the necessity of a formal arrest and consequent embarrassment. They took the course of least potential personal intrusion. Had the purse been in fact that of the defendant's wife, nothing more would have come of the affair.

Other cases subsequent to *Creach* recognize the right to temporarily detain and interrogate before *Miranda* warnings are given under circumstances where because of the police presence the citizen is in fact temporarily not free to leave pending questioning. *State v. Cloud,* 7 Wn. App. 211, 498 P.2d 907 (1972); *State v. Haverty,* 3 Wn. App. 495, 475 P.2d 887 (1970); *State v. Lister,* 2 Wn. App. 737, 469 P.2d 597 (1970). *See People v. Hill,* 12 Cal. 3d 731, 528 P.2d 1, 117 Cal. Rptr. 393 (1974).

Further, it is of some significance that the officer's question, "What do we have here?", did not call for the reply which was given, "It's my wife's." The answer was not responsive to the question put, which question if not merely rhetorical, only called for an answer describing the object, not the identity of the owner.

We then turn to the last issue involved in this case. Defendant alleges that since the search of the purse was not for weapons but for identification, the stop and frisk rule of *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), cannot be used for its justification. Defendant would therefore conclude that the search was unlawful and his silence, having been its product, was constitutionally inadmissible.

---

[1]The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, and thereby risk a violation of the Fourth Amendment if they act too soon and a violation of the Sixth Amendment if they wait too long. *Hoffa v. United States,* 385 U.S. 293, 310, 17 L. Ed. 2d 374, 386, 87 S. Ct. 408 (1966).

■ We must disagree. Although the search may not have been part of the stop and frisk, the touchstone of any search and seizure question is the reasonableness of the officer's conduct under the circumstances. *Pennsylvania v. Mimms,* 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977). This is particularly true in those situations wherein the search is not of the kind which can be subjected to the warrant procedure due to the need for quick police action. *Terry v. Ohio, supra.*

It must always be remembered that what the Constitution forbids is not all searches and seizures, but *unreasonable* searches and seizures. Without pausing to analyze individual decisions, it can fairly be said that in applying the Fourth Amendment this Court has seldom shown itself unaware of the practical demands of effective criminal investigation and law enforcement.

(Italics ours.) *Elkins v. United States,* 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 80 S. Ct. 1437 (1960).

Whether a particular action is reasonable depends upon a balancing of the interests involved, *i.e.,* the need to search against the resulting intrusion. *Camara v. Municipal Court,* 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). In applying this test to the case at hand, we find the following situation: the male defendant had in his possession a woman's purse; he volunteered a plausible explanation as to its ownership; the officer did not have time to obtain a search warrant and instead chose the slight intrusion of opening the purse so as to search for identification; it was a limited search as opposed to a general exploratory search of the purse; and upon finding the identification the search terminated. It is against these circumstances which the reasonableness of the officer's conduct must be tested. We cannot say that such police action is an unreasonable intrusion where the officer observes the defendant's suspicious activity and then chooses the quickest, most practical and least intrusive manner of ascertaining whether or not the plausible explanation given by the defendant is in fact true. *Jones v. State,* 131 Ga. App. 699, 206 S.E.2d 601

(1974). *See also United States v. Smith,* 68 F. Supp. 737 (D.D.C. 1946).

Furthermore, the courts have recognized the problems which confront police officers during a street investigation of suspicious activity, and have upheld their right to conduct a limited search and seizure as a valid intermediate response. *Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972); *Terry v. Ohio, supra; State v. Clark,* 13 Wn. App. 21, 533 P.2d 387 (1975); *State v. Proctor,* 12 Wn. App. 274, 529 P.2d 472 (1974). The officer's opening of the purse under the circumstances here involved was such a valid intermediate response.

Accordingly, we hold that the officer acted reasonably under the circumstances. We fail to see how there can be any constitutional invasion of the defendant's rights if the officer field checks for identification relating to the true ownership of the property which may or may not have been the subject of the theft. It would be highly impractical to seek a search warrant. It would be risky to arrest at this point. As previously noted, if defendant's answer had been truthful, he then would have been able to answer the officer's second question and the incident would have been over with only the slightest of intrusions.

The judgment and sentence are affirmed.

PEARSON, C.J., and PETRIE, J., concur.