[No. 11964-8-I.   Division One.   February 21, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. DOUGLAS L. MCALPIN, *Appellant.*

708

*Demco, Zaetsch & Kemp* and *Eric H. Zaetsch,* for appellant.

*Seth Dawson, Prosecuting Attorney,* and *R. Scott Bowen, Deputy,* for respondent.

SWANSON, J.—Douglas L. McAlpin appeals his felony convictions on five counts of possession of, and possession with intent to deliver, controlled substances which consisted of cocaine, marijuana, and Quaaludes. The judgment and sentence was entered following a combined suppression hearing and a stipulated, expedited trial to the court.

McAlpin's appeal does not challenge the sufficiency of the evidence to uphold his convictions. His claims of error are all directed to the trial court's refusal to suppress certain evidence seized in two separate searches—one of his

home on December 12, 1980 and the other of his briefcase on March 2, 1981.

The trial court's detailed findings of fact entered after hearing extensive testimony presented by both parties at the suppression hearings may be summarized as follows:[1]

### SEARCH AND SEIZURE OF COCAINE, MARIJUANA AND AMPHETAMINES AT MCALPIN'S HOME
### (Counts 1 to 4)

McAlpin awoke in the bedroom of his Lynnwood home in the early morning of December 12, 1980 to discover that his 25–year–old wife had stopped breathing. Unable to resuscitate her, he telephoned for medical assistance. Snohomish County authorities dispatched Firemen Gibler and Westerman from their nearby station.

Deputy Sheriff Nichols and a reserve deputy named O'Neill, both qualified emergency medical technicians, overheard the dispatch and responded to the call believing they would be able to assist.

McAlpin rushed the firemen into the house when they arrived at 4:57 a.m. The trial court found that sheriff's deputies Nichols and O'Neill also arrived at 4:57 a.m. and, with McAlpin's permission to enter, followed the firemen into the house. By the time Deputies Nichols and O'Neill entered the bedroom, Fireman Gibler had pulled Mrs. McAlpin off the bed and onto the floor to commence cardiopulmonary resuscitation (C.P.R.). In doing so, he cut his hand on a broken glass and spread some blood on the body.

Nichols escorted McAlpin from the small room at Fireman Gibler's request and, without advising him of his rights, questioned McAlpin about the circumstances of his wife's condition. Nichols testified that this was to facilitate the firemen's lifesaving activities.

---

[1]The trial court judge was not satisfied with either the State's proposed findings or those prepared by defense counsel and, as is apparent from the record, carefully prepared his own findings which we conclude are supported convincingly by the evidence.

Within several minutes, paramedics arrived and relieved the firemen who had continued C.P.R., although they had discerned no vital signs. Shortly thereafter, at 5:07 a.m., the paramedics determined that Mrs. McAlpin was beyond resuscitation and abandoned their efforts. The coroner later determined the time of death to have been around 2:30 a.m.

While the firemen and paramedics were responding to the apparent medical emergency, a closet curtain near the body was accidentally knocked down or pushed aside. This revealed firearms and controlled substances. By the time Deputy Nichols reentered the room and saw the contraband, the paramedics had abandoned all aid. Seeing the drugs and the dead body with blood on it, Nichols assumed that he was at the scene of a crime and notified homicide Detective Ward.

Ward arrived at about 5:50 a.m. and, with what the trial court found to be McAlpin's implied consent, was escorted in by another officer who was already on the scene. Ward proceeded to the bedroom, saw the body and the apparent contraband in the closet, and discovered on top of the disheveled dresser a small, ceramic pipe and a large baggie containing marijuana seeds.

Detective Ward returned to the living room, advised McAlpin of his rights, and then asked McAlpin for his permission to search the house. McAlpin refused consent.

Snohomish County Superior Court Judge Britt issued a search warrant for the entire house based upon Detective Ward's affidavit which listed only the items in plain view on top of the dresser consisting of the seeds and the pipe.

The sequentially numbered photographs admitted into evidence indicated that the officers conducted a more thorough search of the premises before Ward returned with the warrant.

The trial judge suppressed all evidence discovered during this interim search. He did not suppress the evidence discovered in the closet, however, on the basis that it fell within the plain view exception to the warrant requirement.

The trial court found that the "only material disputed

fact is defendant's contention that a cardboard box or boxes containing cocaine had been located under the bed rather than in the closet." As to this disputed fact, the court found "that the cocaine was in the closet when discovered after the curtain over the closet had been accidentally or inadvertently pushed aside during the effort to save Mrs. McAlpin's life."

Based upon this evidence, McAlpin was found guilty of possession of cocaine and marijuana with intent to deliver (counts 1 and 2 respectively), and guilty of possession of more than 40 grams of marijuana (count 3). The trial court dismissed count 4—possession of amphetamines with intent to deliver—after suppressing the introduction of the amphetamines as the fruits of an illegal search.

### SEARCH OF MCALPIN'S BRIEFCASE FOLLOWING LYNNWOOD TRAFFIC ACCIDENT
#### (Counts 5 and 6)

In a subsequent but unrelated incident, McAlpin caused a 4-car accident at a major intersection in Lynnwood during the noon hour on March 2, 1981. Unable to extricate his truck, he grabbed his satchel–type briefcase and fled to a restaurant about 40 yards away.

When Lynnwood Police Officer Huntley arrived, participants and witnesses relayed this information to him and described McAlpin, whom they perceived as being "high" on alcohol or drugs.

Huntley proceeded to the restaurant where he confronted McAlpin who also appeared to Huntley to be under the influence of drugs or alcohol. At this time Huntley also noticed that the people in the restaurant appeared fearful and were trying to get his attention.

As they were leaving the restaurant to return to the scene of the accident, Officer Huntley asked McAlpin if he had forgotten his briefcase. Restaurant patrons, who appeared considerably distressed and agitated, exclaimed that the satchel was "over there, it's over there." McAlpin showed considerable alarm and rushed for the briefcase. Huntley

intercepted McAlpin. The ensuing struggle over the brief-case resulted in McAlpin being handcuffed, frisked for weapons, read his rights, and placed in the backseat of the police car. Huntley placed the satchel in the front seat.

A radio dispatch from the police station then revealed to Huntley that a restaurant employee had called the police to tell them that McAlpin had been carrying a gun in a holster on his person and waving it about in the restaurant. Huntley believed it was immediately necessary to locate the gun to prevent undue risk to the public and officers present. He easily pushed back the locked flap, which covered one–third of the open–ended top of the heavy, satchel–type briefcase, looked in and saw a large baggie of marijuana, and then as the trial court found,

> reached in, felt what appeared to be a gun, pulled the gun out and when he pulled the gun out apparently a roll of money came out with it. At the point the gun was secured the satchel was not searched further until a search warrant had been obtained.

CrR 3.5 hearing. Clerk's Papers, at 74. The subsequent search pursuant to the warrant revealed Quaaludes.

Still concerned about the possible existence of another gun, Huntley refrisked McAlpin and one of the other two officers at the scene searched the restaurant.

After concluding the accident investigation, Huntley formally placed McAlpin under arrest.

The trial judge admitted all evidence discovered in the briefcase and found McAlpin guilty of possession of Quaaludes (count 6) and possession of more than 40 grams of marijuana with intent to deliver (count 5).

### SEARCH AND SEIZURE AT MCALPIN'S HOME

McAlpin assigns several errors to the trial court's resolution of the issues involved in the search and seizure of contraband in his home. He contends that (1) the evidence does not support the trial court's conclusion that all elements of the "plain view" exception to the warrant requirement were met; (2) Detective Ward's affidavit for a search

warrant did not establish probable cause; and (3) Detective Ward's willfully excluding from the affidavit evidence observed in the closet rendered the affidavit fatally defective.

We first address McAlpin's contention that the elements of the "plain view" exception to the Fourth Amendment were not established by the evidence presented.

Because the trial court heard extensive oral testimony from many witnesses, including McAlpin, at the suppression hearing, we must give deference to the trial court's findings of fact and not substitute our judgment for that of the trial court, nor weigh the evidence or credibility of the witnesses. *Davis v. Department of Labor & Indus.,* 94 Wn.2d 119, 124, 615 P.2d 1279 (1980). We will not, however, blindly accept the findings of fact as verities, *State v. Hoffman,* 64 Wn.2d 445, 451, 392 P.2d 237 (1964); there must be sufficient evidence from which a rational trier of fact could reasonably conclude beyond a reasonable doubt that the verdict was correct. *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980). As noted above, we conclude that there was sufficient and substantial evidence to support the trial court's findings of fact.

The "plain view" exception to the Fourth Amendment's warrant requirement has three elements: (1) a prior justification for the police intrusion; (2) an inadvertent discovery of incriminating evidence; and (3) the immediate knowledge by the police that the item seen is incriminating. *Washington v. Chrisman,* 455 U.S. 1, 70 L. Ed. 2d 778, 102 S. Ct. 812 (1982); *State v. Lair,* 95 Wn.2d 706, 714, 630 P.2d 427 (1981). All three of these elements are present here.

First, McAlpin voluntarily requested medical aid. Thus, Mrs. McAlpin's death prior to the arrival of the medical aid unit and paramedics did not detract from their being present with McAlpin's consent. Furthermore, medical aid personnel had a reasonable time to vacate the premises after declaration of death before they exceeded the scope of McAlpin's consent. Thus, even an inadvertent discovery

after emergency medical aid had ceased would legitimize the plain view seizure here.

We concur with the trial court that Deputies Nichols and O'Neill were also in the home with McAlpin's consent. The officers responded to McAlpin's emergency call with the intent to render emergency medical aid. Their subsequent actions were also consistent with that intent.

Second, the appellant admits that the firemen were obligated to continue rendering medical aid until someone having authority declared Mrs. McAlpin dead. Substantial evidence establishes that no such declaration of death occurred prior to the medical aid personnel accidentally moving the curtain and inadvertently discovering the contraband in the closet.

Moreover, no police investigation precipitated the discovery; rather, the firemen revealed their inadvertent discovery to the police. Thus, the directed discovery by the police did not taint the inadvertent discovery by the medical aid personnel. *Accord, United States v. Tripp,* 468 F.2d 569 (9th Cir. 1972), *cert. denied,* 410 U.S. 910 (1973).

Third, McAlpin does not question the immanent incriminating nature of the evidence in the closet, although he questions the nature of the pipe and seeds found on the dresser top. Therefore, the final element of the "plain view" exception is deemed to have been fulfilled with respect to the evidence within the closet which was subject to the "plain view" seizure. *See State v. Penn,* 32 Wn. App. 911, 650 P.2d 1111, *review denied,* 98 Wn.2d 1012 (1982).

Detective Ward's knowledge of the existence of contraband prior to his arrival does not invalidate the prior "plain view" seizure. Where the initial intrusion which brings the police within the plain view of evidence is based upon an exception to the warrant requirement, as here, the seizure is legitimate. *State v. Lair,* 95 Wn.2d at 715.

We now turn to McAlpin's second and third contentions which the trial court adequately answered in the following language:

I conclude that the affidavit supporting the request for a search warrant which was submitted to Judge Britt was not complete inasmuch as it did not contain all of the information that Detective Ward was privy to at that time. It did, however, contain sufficient information to warrant the search and I do not conclude that the failure to include the information about drugs in the closet was anything other than an exercise by Detective Ward of extreme caution. Detective Ward was unsure whether those materials had been properly viewed, as he hadn't been there at the time they were discovered. He did not want to jeopardize an otherwise legitimate request for a search warrant by including reference to items that may or may not have been properly viewed. Detective Ward's failure to include his knowledge of the existence of controlled substances and weapons in the closet does not, under any conceivable argument, constitute a violation of Mr. McAlpin's 4th Amendment, or any other constitutional rights.

CrR 3.5 hearing. Clerk's Papers, at 71.

Moreover, because all evidence other than that discovered in the closet and on top of the dresser was excluded below, we need not consider questions concerning Detective Ward's affidavit for a search warrant, the warrant itself, nor the admission of evidence discovered outside the plain view of the paramedics, firemen, and police in the bedroom. Additionally, we need not consider the impact of Ward's prior knowledge on subsequently discovered evidence, nor whether the incriminating nature of the pipe and seeds discovered on the dresser was immediately apparent on sight, as it was not a basis for conviction.

### Search and Seizure of McAlpin's Briefcase

We now turn our analysis to the second incident and to McAlpin's contention that the warrantless search of his briefcase was not sanctioned by exigent circumstances.

The fourth amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . .

By having locked his briefcase, McAlpin exhibited a legitimate expectation of privacy in its unviolated nature. *United States v. Schleis,* 582 F.2d 1166, 1170 (8th Cir. 1978). Thus, the Fourth Amendment's proscription attached and the warrantless search was constitutional only if it was not unreasonable. *United States v. Chadwick,* 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977).

In the absence of a search warrant, the burden falls upon the State to overcome the presumption that the search was unreasonable. *Chadwick; State v. Shoemaker,* 28 Wn. App. 787, 626 P.2d 538 (1981). That reasonableness depends upon the circumstances of the case and is assayed by balancing the gravity of the intrusion of one's personal security against the public's interest in law enforcement. *State v. Hobart,* 94 Wn.2d 437, 617 P.2d 429 (1980); *State v. Webster,* 20 Wn. App. 128, 579 P.2d 985 (1978).

Neither party asserts that the warrantless search fell within one of the well recognized exceptions to the warrant requirement, *e.g.,* search incident to an arrest. Instead, we are asked to determine whether the exigencies of these particular circumstances permit us to conclude that the search was reasonable.

Our Supreme Court recently adopted a 2–pronged test to determine whether a warrantless search was reasonable in a medical emergency situation.

> First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, even though the requisite motivation is found to exist, until it can be found that a reasonable person under the circumstances would have thought an emergency existed, the search is invalid.

*State v. Loewen,* 97 Wn.2d 562, 568, 647 P.2d 489 (1982) (quoting *State v. Prober,* 98 Wis. 2d 345, 365, 297 N.W.2d 1 (1980)). We find this analysis and reasoning compelling in the instant case.

The State has proved that both the subjective and objective conditions of *Loewen* were met. First, Officer Huntley testified that he believed it was necessary for the safety of

the public, other officers, and himself, that the gun be found as quickly as possible. Second, as specifically found by the trial judge,

> It must be remembered that at this point one of the major intersections in the city ofLynnwood [*sic*] was tied up with a multi–car accident[;] there were witnesses, participants, spectators and law enforcement officers standing around. A gun had turned up missing and it was incumbent for the officer to locate it for his own as well as everybody else's protection. The officer's search was limited to looking for a gun, and as soon as he located the gun no further search was conducted until a warrant was obtained.

CrR 3.5 hearing. Clerk's Papers, at 75. Thus, there would have been immediate and extreme danger to a great number of people if the revolver had fallen into untrained or malicious hands. *See Cady v. Dombrowski,* 413 U.S. 433, 443, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973).

An "emergency" by definition under constitutional analysis presupposes a lack of reasonable time to obtain a warrant.

> Decisions of the Supreme Court clearly emphasize an overriding principle or rule, the desirability—*if not the necessity*—for police officers to obtain search warrants *unless they are confronted by emergencies and exigencies* which do not permit reasonable time and delay for a judicial officer to evaluate and act upon probable cause applications for warrants by police officers.

(Citation omitted.) *State v. Smith,* 88 Wn.2d 127, 135, 559 P.2d 970, *cert. denied,* 434 U.S. 876 (1977). Although there would have been sufficient probable cause to obtain a search warrant, one could not have been obtained with the celerity demanded by the circumstances, notwithstanding the telephonic warrant provisions in CrR 2.3(c).

The trial court considered the time required within which to obtain a search warrant in these circumstances and said,

> I further note that all this happened during the noon hour. By the time the police were able to get a search warrant, which included preparing an affidavit for a

search warrant, having it typed up and presented to a magistrate and served on the defendant, it was 4:30 in the afternoon.

CrR 3.5 hearing. Clerk's Papers, at 75.

Balancing the fact that the slight intrusion into the easily accessible briefcase was limited in purpose and scope, and terminated upon the discovery of the gun, with Officer Huntley's subjective belief that an emergency existed and our belief that a reasonable person under these circumstances would have thought an emergency existed which demanded an immediate, but limited, search, *see State v. Webster, supra,* we conclude that the search was reasonable and, therefore, constitutional. Hence, it follows that the affidavit supporting the search warrant was not infirm, and the evidence discovered through the execution of the warrant was properly admitted.

Accordingly, we affirm the convictions below.

WILLIAMS and CALLOW, JJ., concur.

Reconsideration denied May 15, 1984.

Review denied by Supreme Court August 10, 1984.