51 P.3d 143 (2002)
112 Wash.App. 787
STATE of Washington, Respondent,
v.
James Ross THOMPSON, Appellant.
No. 27140-1-II.
Court of Appeals of Washington, Division 2.
August 2, 2002.
*145 Rita Joan Griffith, Seattle, for Appellant.
Kathleen Proctor, Dpty Pros Attorney, Maureen Goodman, Rule 9 Intern, Tacoma, for Respondent.
*144 SEINFELD, J.
James Thompson appeals his conviction for unlawful manufacture of a controlled substance, contending that the trial court erred in denying his motion to suppress evidence that the police obtained when they arrested him at his home. He argues that his outstanding arrest warrant for failure to appear at a contempt hearing, which arose out of a child support issue, did not support the use of a nonconsensual entry into his travel trailer. We hold that police may use RCW 10.31.040, which authorizes forcible entry for arrests "in criminal actions," where there is a general arrest warrant and we further find that the searches following Thompson's arrest were valid. Thus, we affirm.

FACTS[1]
According to the testimony of Deputy Sheriff Terrill Larson, John Thompson asked Larson to arrest his son James Thompson on an outstanding arrest warrant that was related to the failure to pay child support.[2] John Thompson also told Larson that he suspected his son was engaging in illicit drug activity.
Larson confirmed that Thompson had an outstanding arrest warrant for failure to appear for a show cause hearing in superior court. The bench warrant indicated that Thompson had failed to appear at a contempt review hearing.
Later that day, Larson and his partner went to John Thompson's Fox Island property where Thompson was living in a 22-foot travel trailer. There were also two buildings on the property, the main house with attached garage and a detached boathouse.
Larson knocked on the travel trailer door and announced, "This is the Sheriff's office, I have a warrant for James [sic] arrest." Clerk's Papers (CP) at 82. Larson heard movement and scuffling inside the trailer that he did not believe were related to opening the door. After about 10 seconds, Larson opened the door. Larson immediately saw Thompson and ordered him out of the trailer, handcuffed him and later placed him in the patrol car.
Meanwhile, Larson saw another man, later identified as Eric Sund inside. Larson ordered Sund out, patted him down for weapons, and then asked him to leave. At this point, Sund either asked Larson to retrieve his coat from inside the trailer or asked if he could do so.
Larson stepped inside the trailer to retrieve the jacket and in the three seconds it took to do this, he smelled a strong chemical odor like paint thinner, he saw a glass container with a white crystalline substance through the open door of the oven, and he observed foil with a white powder and glass *146 smoking pipes. Based on his experience, Larson was concerned that there was a methamphetamine lab on the premises.
When Larson stepped out, Sund had disappeared. Consequently, Larson went toward the main house where the senior Thompsons lived to look for Sund and to tell John Thompson about his son's arrest. Larson testified that he wanted to arrest Sund because he had been in the trailer where Larson observed the suspicious items.
The senior Thompsons said that no one had come to the house and John Thompson asked Larson to search the attached garage. Larson found no one in the garage and he then asked John Thompson about the detached boathouse. John Thompson said that it was his, that Thompson used it, and replied, "Please do," when Larson asked if he could look inside. Report of Proceedings (RP) at 45.
Larson did not find Sund in the boathouse but, in a living area on the second floor, he found items consistent with a methamphetamine lab. Larson then asked the senior Thompsons to sign a consent form for a search of the boathouse, which they did. Larson did not ask Thompson for consent.
In response to a call from Larson, Deputy Harms, a clandestine lab investigator, came to the property, spoke with Larson, entered the trailer to verify that the oven was off, looked into a burn barrel and burn piles on the property that contained evidence of a methamphetamine lab, checked the safety of a corroded propane tank in front of the trailer, and looked inside the boathouse. After determining that the property appeared to be a "fairly safe environment," he secured the premises and returned the next day with a search warrant. RP at 80.
The State charged Thompson with one count of unlawful manufacture of a controlled substance, methamphetamine. RCW 69.50.401(a)(1)(ii). Thompson moved to suppress the evidence obtained following his arrest. The trial court denied the motion and subsequently convicted Thompson in a bench trial on stipulated evidence and imposed a drug offender sentencing alternative.

DISCUSSION

I. RCW 10.31.040"KNOCK AND WAIT" STATUTE
Thompson alleges that his arrest was for a civil matter and, consequently, Deputy Larson lacked authority under the "knock and wait" statute to open his trailer door to make the arrest. See RCW 10.31.040. Thus, Thompson challenges both the arrest and the subsequent searches.
The "knock and wait" statute provides: "To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance." RCW 10.31.040 (emphasis added). Under the statute, before a nonconsensual entry, police officers must "(1) announce their identity, (2) announce their purpose, (3) demand admittance, (4) announce the purpose of their demand, and (5) be explicitly or implicitly denied admittance." State v. Richards, 136 Wash.2d 361, 369, 962 P.2d 118 (1998). The statute applies whenever officers seek to enter the premises without valid permission. State v. Coyle, 95 Wash.2d 1, 5, 621 P.2d 1256 (1980).
Thompson does not argue that the officers did not comply with the procedures in RCW 10.31.040. Rather, he asserts that because his arrest warrant resulted from his failure to appear for a show cause hearing on child support obligations, he was subject only to civil contempt proceedings under RCW 7.21 for his non-compliance. Therefore, Thompson concludes, he was not arrested in a "criminal action."
Thompson's arrest warrant apparently was issued under RCW 26.18.050, which provides:
(1) If an obligor fails to comply with a support or spousal maintenance order, a petition or motion may be filed without notice under RCW 26.18.040 to initiate a contempt action as provided in chapter 7.21 RCW. If the court finds there is reasonable cause to believe the obligor has failed to comply with a support or spousal maintenance order, the court may issue *147 an order to show cause requiring the obligor to appear at a certain time and place for a hearing, at which time the obligor may appear to show cause why the relief requested should not be granted....
....
(3) If the order to show cause served upon the obligor included a warning that an arrest warrant could be issued for failure to appear, the court may issue a bench warrant for the arrest of the obligor if the obligor fails to appear on the return date provided in the order.

....
(5) As provided in RCW 26.18.040, the court retains continuing jurisdiction under this chapter and may use a contempt action to enforce a support or maintenance order until the obligor satisfies all duties of support, including arrearages, that accrued pursuant to the support or maintenance order.
(emphasis added). A contempt action under RCW 7.21, which the trial court has authority to use to enforce a support order, may involve remedial or punitive sanctions. RCW 7.21.030 (remedial sanctions); RCW 7.21.040 (punitive sanctions).
Even if we could determine that it is more likely that an arrest under RCW 26.18.050 would lead to a civil contempt action under RCW 7.21 rather than to a criminal proceeding, the record does not provide a basis for the officers to make this conclusion at the time of the arrest. The bench warrant states:
TO ALL PEACE OFFICERS IN THE STATE OF WASHINGTON, GREETING:
WHEREAS, [an] Order of Court has been entered directing the Clerk of the above entitled Court to issue a warrant for the arrest of the above named respondent, JAMES ROSS THOMPSON, [identifying information];
You are hereby commanded to forthwith arrest the said JAMES ROSS THOMPSON for failure to appear at the Contempt Review Hearing and bring him into Court to be dealt with according to law. Bail is to be set in open Court.
CP at 40.
Thus, although the warrant for Thompson's arrest could have resulted in either a civil or a criminal contempt action, we decline to require officers at the scene of an arrest to anticipate the nature of any resulting court proceeding. As the officers had a duty to arrest once they knew of the warrant and there is no evidence of bad faith, the officers did not unreasonably use the "knock and wait" statute under the facts of this case. See State v. Chelly, 94 Wash.App. 254, 262, 970 P.2d 376 (1999).
We further note that there is no showing that the arrest here violated constitutional protections. See Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."); State v. Williams, 142 Wash.2d 17, 24, 11 P.3d 714 (2000) (defendant could not successfully challenge police entry into his home to serve arrest warrant and defendant has no additional privacy protections when he is arrested in home of third person who consents to police entry). Finally, the presence of a neutral magistrate issuing the bench warrant provides an additional layer of protection "between the zealous officer and the citizen." Payton, 445 U.S. at 602, 100 S.Ct. 1371. Thus, the trial court did not err in denying Thompson's motion to suppress.

II. THE SEARCHES
A. TRAVEL TRAILER
Thompson argues that even if his arrest was valid, i.e., that the "knock and wait" statute applied, Larson's subsequent three-second entry into the trailer to retrieve Sund's jacket was an unconstitutional search. It was during this entry that Larson smelled a strong chemical odor and observed the suspicious object through the open oven door.
*148 The community caretaking function allows for limited invasion of fourth amendment privacy rights when necessary to render aid or assistance or make routine checks on health and safety. State v. Kinzy, 141 Wash.2d 373, 386, 5 P.3d 668 (2000), cert. denied, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001). But the dissent contends that the community caretaking function is not applicable here because there was no evidence that anyone was in danger or that Sund or Thompson had a weapon. We believe this is too narrow a reading of the community caretaking function.
The evidence here indicates that Larson was in a somewhat rural location executing an arrest warrant for a person who, according to the arrestee's father, was probably engaged in illicit drug activity. The arrestee lived in a small trailer but did not immediately open the door; while Larson waited there were unexplained sounds of movement and shuffling. Two men then appeared from inside.
Given these circumstances, it was reasonable for Larson to deny Sund permission to re-enter the trailer where he might gain access to a weapon. Clearly, Larson could have told Sund to leave without his jacket. But instead, Larson offered to step inside the door and grab the jacket that was within reach.
The evidence shows that Larson subjectively believed Sund needed help in obtaining his jacket, a reasonable person in this situation would have the same belief, and it was necessary to enter the trailer to retrieve the jacket. See State v. Johnson, 104 Wash.App. 409, 415, 16 P.3d 680, review denied, 143 Wash.2d 1024, 25 P.3d 1020 (2001). And the trial court found that the oven door was open and the item in the oven was in plain view. See State v. Chrisman, 100 Wash.2d 814, 819, 676 P.2d 419 (1984) (requirements of plain view exception are "`(1) a prior justification for intrusion; (2) inadvertent discovery of incriminating evidence; and (3) immediate knowledge by the officer that he had evidence before him'") (quoting State v. Chrisman, 94 Wash.2d 711, 715, 619 P.2d 971 (1980), rev'd, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982)). Thus, Larson's brief entry was within his community caretaking authority.
When police initiate such encounters for "noncriminal noninvestigatory purposes," we determine the admissibility of evidence gained therefrom by balancing "`the individual's interest in freedom from police interference against the public's interest in having the police perform a `community caretaking function.'" State v. Lynch, 84 Wash.App. 467, 477, 929 P.2d 460 (1996) (quoting State v. Mennegar, 114 Wash.2d 304, 313, 787 P.2d 1347 (1990)). Given Larson's exceedingly brief entry during which he took no improper steps and saw only what was in plain view, and given the additional circumstances discussed above, the scales tip in favor of admitting the fruit of Larson's momentary incursion into Thompson's privacy. Accordingly, Larson's entry was not an unconstitutional search.
B. BURN BARREL & BURN PILES
Thompson challenges Deputy Harms's search of the burn barrel and burn piles, arguing that the trial court erred in concluding that the evidence recovered was in open view. He argues (1) that the evidence recovered was the fruit of Larson's unlawful search of the trailer; and (2) that the search was unlawful because the barrel and burn piles were not within the trailer's curtilage. But the search is valid under the emergency exception to the warrant requirement.
[W]hen premises contain persons in imminent danger of death or harm; objects likely to burn, explode or otherwise cause harm; or information that will disclose the location of a threatened victim or the existence of such a threat, police may search those premises without first obtaining a warrant.
State v. Downey, 53 Wash.App. 543, 544-45, 768 P.2d 502 (1989). See also State v. Bakke, 44 Wash.App. 830, 834, 723 P.2d 534 (1986) ("The need to protect or preserve life, avoid serious injury, or protect property in danger of damage justifies an entry that would otherwise be illegal absent an exigency or emergency.").
*149 To justify application of the emergency exception, the State must show that: "(1) the searching officer subjectively believed an emergency existed; and (2) a reasonable person in the same circumstances would have thought an emergency existed." Downey, 53 Wash.App. at 545, 768 P.2d 502. Here, Harms testified that he was called regarding a possible methamphetamine lab and was asked to do an "assessment" of the premises to determine, in part, "what the dangers to anybody that may have come in contact with the lab are." RP at 73. As part of that assessment, he checked the trailer's oven and the propane tank in front of the trailer, looked in the burn barrel and burn piles on the property, and looked in the boathouse. Once he determined that the premises appeared safe for the moment, he stopped his search and secured the premises until he had a search warrant.
Given Harms's experience with methamphetamine labs and the potential danger to the officers, to the Thompsons' property, and to the Thompsons themselves, these limited actions were reasonable. See Downey, 53 Wash.App. at 543-46, 768 P.2d 502 (upholding search of residence where officers were dispatched to investigate an overpowering ether odor; officers knew that ether could be extremely volatile and explosive, the home was in a residential area where an explosion would have dire consequences, and officers did not know whether anyone incapacitated by the fumes remained in residence). See also Johnson, 104 Wash.App. at 409, 16 P.3d 680 (must balance competing policies of allowing police to help people in danger and of protecting against unreasonable searches).
Thompson focuses on the lack of "open view" to challenge the search. But (1) he did not raise this argument before the trial court; and (2) as we uphold the search under the emergency exception to the warrant requirement, we need not reach this issue.
C. BOATHOUSE
The trial court concluded that both the initial search of, and the consent to search the boathouse, were invalid because Larson failed to obtain Thompson's consent as a cohabitant of the premises. But the court also concluded that the items in the boathouse would have been inevitably discovered upon the execution of the valid search warrant. Both parties challenge these conclusions.
1. Validity of Consent to Search
The State assigns error to two of the trial court's conclusions of law:
6. Deputy Larson's initial search of the boathouse was not valid.
7. The consent to search the boathouse was not valid because the deputies did not obtain the defendant's consent pursuant to State v. Walker, 136 Wash.2d 678, 686, 965 P.2d 1079 (1998), as the defendant was [present] at the scene, and he was a [cohabitant] on the premises.
CP at 85-86. The State argues that where Thompson did not live in the boathouse or have exclusive authority over the premises, the senior Thompsons, as the legal owners of the property, had the superior right to consent to the search of the boathouse. Additionally, the State contends that the search of the boathouse was appropriate based on exigent circumstances.
The Fox Island property belonged to the senior Thompsons although Thompson was the registered owner of the travel trailer where he lived rent free. Thompson had his parents' permission to use the boathouse but they did not have a written agreement as to the use. John Thompson had access to the boathouse and used it for storage but after his son moved the boat out, he never went out there. After Larson's discovery of illicit drug evidence in the trailer, John Thompson told Larson that he owned the boathouse and that Thompson was doing something in there all the time.
Based on the above evidence, the trial court erred in concluding that the senior Thompsons could not unilaterally consent to the search of the boathouse. See State v. Walker, 136 Wash.2d 678, 682-86, 965 P.2d 1079 (1998). The evidence satisfies the three requirements for establishing a consensual warrantless search: "(1) the consent must be voluntary; (2) the person granting consent must have authority to consent; and (3) the *150 search must not exceed the scope of the consent." Walker, 136 Wash.2d at 682, 965 P.2d 1079. When there are cohabitants, Washington courts follow the "common authority" rule:
Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent... rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
State v. Mathe, 102 Wash.2d 537, 543, 688 P.2d 859 (1984) (quoting United States v. Matlock, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)).
We recently reviewed the Washington cases addressing the common authority rule to determine "whether one cohabitant of a residence may consent to an officer's entering the common living area of the residence, without the consent of a second cohabitant who is present nearby." State v. Hoggatt, 108 Wash.App. 257, 263, 30 P.3d 488 (2001). See, e.g., Walker, 136 Wash.2d at 684-86, 965 P.2d 1079 (upholding admission of evidence against wife who consented to search of home even though husband was present at time and did not consent to search; wife's consent would not be valid against husband but remained valid against her); State v. Leach, 113 Wash.2d 735, 737-38, 744, 782 P.2d 1035 (1989) (search invalid where girlfriend of business owner consented to search but officers apparently did not obtain consent of defendant owner although he was present at time; consent of cohabitant remained valid "only while the [other] cohabitant is absent"); Mathe, 102 Wash.2d at 541, 544, 688 P.2d 859 (search invalid where officers obtained consent to search from the residence's owner but did not get consent from the defendant who rented and had exclusive control over the room searched in the residence).
The Hoggatt court concluded that the cases distinguish between: "(1) a searching officer's initial entry into the area of a home into which visitors are customarily received (e.g., the living room) and (2) a searching officer's intrusion into parts of the home into which visitors are not customarily received (e.g., a couple's bedroom)." 108 Wash.App. at 267, 30 P.3d 488. This distinction is based on the assumption of risk theory espoused in Matlock and in Mathe. Hoggatt, 108 Wash.App. at 269, 30 P.3d 488. The court thus characterized the ultimate question as: "Does one cohabitant of a home assume the risk that an officer will enter that part of the home customarily used to receive guests (e.g., the living room), based only on the consent of a different cohabitant?" Hoggatt, 108 Wash.App. at 269, 30 P.3d 488. The court answered yes even though the defendant was present at the time. Hoggatt, 108 Wash.App. at 269, 30 P.3d 488.
Here, where all three Thompsons apparently had control over the boathouse, Thompson assumed the risk that his parents would consent to police entry without his consent even though he was present at the time of the entry. And Thompson's efforts to distinguish Hoggatt by emphasizing that the boathouse was not "a common area where guests were routinely invited to enter," are not persuasive. Reply Br. of Appellant at 15.
The boathouse, while not an area for receiving "guests" on a regular basis is an area where one cohabitant might receive a visitor without the other cohabitant's consent even when the other cohabitant is present. For instance, the senior Thompsons could have invited visitors into the boathouse to use the landscaping items to do work on the property, including the tractor that they stored there. This makes the boathouse more similar to the living room in Hoggatt than to the bedroom of a residence. Given the nature of the boathouse, Thompson assumed the risk that his parents would consent to police entry into the building. Thus, the senior Thompsons could unilaterally consent to the search and Larson could properly rely on their consent.
Finally, the State contends that in addition to the valid consent for the boathouse search, Deputy Harms properly entered the boathouse *151 based upon an emergency situation. As discussed above in regard to the burn barrel and burn piles, the State's contention has merit. John Thompson had reported to the officer that his son was doing something in the boathouse, and the officers had already found possible methamphetamine laboratory equipment in other areas associated with Thompson. See Downey, 53 Wash.App. at 545, 768 P.2d 502.
2. Inevitable Discovery Doctrine
Thompson challenges the trial court's inevitable discovery conclusion, arguing that the doctrine does not apply because all the evidence and the search warrant resulted from his allegedly unlawful arrest.
Under the inevitable discovery doctrine, the State must prove by a preponderance of the evidence that "the police did not act unreasonably or in an attempt to accelerate discovery, and [that] the evidence would have been inevitably discovered under proper and predictable investigatory procedures." State v. Avila-Avina, 99 Wash.App. 9, 17, 991 P.2d 720 (2000). See also State v. Richman, 85 Wash.App. 568, 577, 933 P.2d 1088 (1997). "[T]he rule allows neither speculation as to whether the evidence would have been discovered, nor speculation as to how it would have been discovered." Richman, 85 Wash.App. at 577, 933 P.2d 1088.
Here, given that we find the police activity prior to the boathouse search to be valid, the police would have inevitably discovered the evidence in the boathouse. Larson's observations in the trailer and Harms's search of the burn barrel and burn piles provided probable cause for a search warrant for the property. See State v. Huft, 106 Wash.2d 206, 209, 720 P.2d 838 (1986). Thus, "proper and predictable investigatory procedures" would have led to the discovery of the evidence in the boathouse. See Avila-Avina, 99 Wash.App. at 17, 991 P.2d 720.
We affirm.
I concur: HUNT, C.J.
ARMSTRONG, J.(Dissenting)
The majority upholds Deputy Larson's warrantless entry into the trailer to retrieve Sund's coat as a community caretaking function. The trial court ruled that Larson was entitled to retrieve the coat for "officer safety reasons because the coat or the trailer could contain a weapon." CP at 83. But the court made no finding that anyone else was in the trailer, that Sund was armed, or that the officers had any reason to believe the trailer or Sund's coat contained weapons. Because the officers had no reason to believe that anyone needed assistance or that Thompson or Sund had weapons, the community caretaking function does not apply and Deputy Larson's entry was not justified. I, therefore, dissent.
An officer may invoke the community caretaking exception if (1) he subjectively believes that someone likely needs assistance for health or safety reasons, (2) a reasonable person in the same situation would believe the same, and (3) he has a reasonable basis to associate the need for help with the place he searched. State v. Johnson, 104 Wash.App. 409, 415, 16 P.3d 680, review denied, 143 Wash.2d 1024, 25 P.3d 1020 (2001). For example, the court upheld a warrantless search when shots had been fired and a person may have been kidnapped, even though a witness said no one was left in the house. State v. Barboza, 57 Wash.App. 822, 790 P.2d 647 (1990). When "gunshots have been fired and a person has been apparently abducted, common sense dictates that the officers should check the home for the presence of hostile people, or possibly a wounded person, before leaving the premises." Barboza, 57 Wash.App. at 828-29, 790 P.2d 647.
We have also applied the community caretaking exception when police have reason to believe a person remaining in the house is in danger. In Johnson, for example, a relative reported domestic violence, the defendant came out of the house with a cut, and the victim appeared at the door shaking and bloodstained. Johnson, 104 Wash.App. at 412-13, 16 P.3d 680. Officers properly entered the house to search for additional victims because children or others may have been inside. Johnson, 104 Wash.App. at 419, *152 16 P.3d 680. In State v. Menz, 75 Wash.App. 351, 880 P.2d 48 (1994), police responding to a domestic violence call entered a home to look for people who could or would not answer their calls. The front door was open on a winter night and the lights and television were on. Menz, 75 Wash.App. at 354, 880 P.2d 48.
And we have upheld searches for missing guns. In McAlpin, for example, a gun was missing at the scene of a major auto accident. State v. McAlpin, 36 Wash.App. 707, 677 P.2d 185 (1984). The court upheld the warrantless search for the gun before it fell into "untrained or malicious hands." McAlpin, 36 Wash.App. at 717, 677 P.2d 185. The Supreme Court also upheld a warrantless search for a gun before police towed a car, owned by an officer, that likely contained a gun. Cady v. Dombrowski, 413 U.S. 433, 443, 446-47, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).
Notably missing here is any evidence that Deputy Larson entered the trailer because he believed someone inside was in immediate danger. Nor is there any evidence that the deputy believed that either Thompson or Sund had a weapon in the coat or the trailer. Rather, the deputy entered the trailer to get Sund's coat. Absent any reason to believe that the coat in the trailer presented a safety threat, the officer's entry of the trailer was not justified as a community caretaking function. And because everything that followed was based upon what the officer learned from the entry, all the evidence of drug manufacturing should have been suppressed. State v. White, 97 Wash.2d 92, 111-12, 640 P.2d 1061 (1982); Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
NOTES
[1] Thompson assigns error to 12 findings of fact that the trial court entered following the CrR 3.5/3.6 hearing but he does not challenge the evidentiary support for those findings. As we treat unchallenged findings of fact as verities on appeal, we rely on them to describe the occurrences here. See State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994).
[2] John Thompson died before the suppression hearing.